# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | | |
|---|---|---|
| LAKE RIDGE NEW TECH SCHOOLS, and<br>LAKE RIDGE MULTI PURPOSE SCHOOL<br>BUILDING CORPORATION, INC., | )<br>)<br>) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 2:17-CV-388-TLS |
| | ) | |
| THE BANK OF NEW YORK MELLON,<br>TRUST COMPANY, N.A., | )<br>) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This matter is before the Court on the Defendant's, Bank of New York Mellon Trust

Company, N.A. ("Bank" or "Trustee"), Motion to Dismiss Plaintiffs' Complaint pursuant to

Federal Rule Civil Procedure 12(b)(6) [ECF No. 38]. The Plaintiffs, Lake Ridge New Tech

Schools and Lake Ridge Multipurpose School Building Corporation (collectively, "Plaintiffs"),

filed their Response on September 24, 2018. [ECF No. 44.] On October 11, 2018, the Bank filed

its Reply [ECF No. 47.] For the reasons stated in this Opinion and Order, the Court GRANTS the

Defendant's Motion.


## BACKGROUND

This case concerns whether the Bank, as an indenture trustee, can be held liable for

processing a fraudulent pay affidavit, purportedly sent by Lake Ridge Multipurpose School

Building Corporation, under contract and tort theories. Accordingly, the Court begins with a

review of the relevant contract and underlying facts.

**A.      September 1, 2015 Trust Indenture Agreement**

The Bank and Lake Ridge Multi School Building Corporation ("Building Corporation") entered into a Trust Indenture Agreement on or about September 1, 2015 [ECF No. 1, Ex. A] ("Indenture Agreement"), which governed the issuance and redemption of municipal bonds to fund the renovation of Calumet High School ("Project") through a trust ("Trust").[1] (Compl. ¶¶ 7–11, ECF No. 5.) Under the Indenture Agreement, the Bank was to act as the indenture trustee and was authorized to employ agents, attorneys, and counsel to administer and execute the Trust. (Compl. ¶ 12.) Construction funds for the Project were deposited and held in the trust account, and the Bank, as indenture trustee, made payments to contractors and vendors on the Project from the trust account upon the submission of a pay affidavit. (Compl. ¶ 15–16.)

The Indenture Agreement contained several provisions governing the Building Corporation's and the Bank's submission and processing of pay affidavits. Under Section 3.01 of the Indenture Agreement, all pay affidavits were to be submitted by an authorized representative of the Building Corporation. Section 3.01 stated: "All payments from the Construction Account shall be made by the Trustee upon presentation of an affidavit executed by an officer of the [Building] Corporation or the Lessor Representative, stating the character of the expenditure, the amount thereof, and to whom due, together with the statement of the creditor as to the amount owing."

Section 10.09 of the Indenture Agreement governed the obligations and rights of the Bank once it had received a pay affidavit. Section 10.09 provided that "the Trustee shall have the right to accept and act upon the instructions, including funds transfer instructions ("Instructions")

---

[1] The Bank indicated that neither of the Plaintiffs are parties to the Indenture Agreement. Plaintiffs' counsel informed the Bank that Lake Ridge Multi Purpose School Building Corporation, Inc., was inadvertently designated as "Lake Ridge Multi School Building Corporation" in the Agreement. (*See* Def.'s Br. in Supp., ECF No. 39, at p. 1 n.1.)

given pursuant to this Indenture and delivered using Electronic Means . . . ." The Agreement

defined "Electronic Means" to include e-mail. (Indenture Agreement § 1.01(g).) Further, with

respect to pay affidavits submitted through Electronic Means, Section 10.09 stated: "If the

[Building] Corporation elects to give the Trustee Instructions using Electronic Means and the

Trustee in its discretion elects to act upon such Instructions, the Trustee's understanding of such

Instructions shall be deemed controlling."

In connection with the authenticity of pay affidavits submitted through Electronic Means,

the Indenture Agreement added: "[The Building] Corporation understands and agrees that the

Trustee cannot determine the identity of the actual sender of such Instructions and that the

Trustee shall conclusively presume that directions that purport to have been sent by an

Authorized Officer listed on the incumbency certificate provided to the Trustee have been sent

by such Authorized Officer." (Indenture Agreement § 10.09.) Moreover, the Agreement

contained the following language regarding the possibility of unauthorized pay affidavit

submissions and liability thereof:

> "The [Building] Corporation shall be responsible for ensuring that only
> Authorized Officers transmit such [pay affidavit] Instructions to the Trustee
> and that the Corporation and all Authorized Officers are solely responsible to
> safeguard the use and confidentiality of applicable user and authorization
> codes, passwords and/or authentication keys upon receipt by the Corporation.
> The Trustee shall not be liable for any losses, costs or expenses arising
> directly or indirectly from the Trustee's reliance upon and compliance with
> such Instructions notwithstanding such directions conflict or are inconsistent
> with a subsequent written instruction. The Corporation agrees: (i) to assume
> all risks arising out of the use of Electronic Means to submit Instructions to
> the Trustee, including without limitation the risk of the Trustee acting on
> unauthorized Instructions, and the risk of interception and misuse by third
> parties; (ii) that it is fully informed of the protections and risks associated
> with the various methods of transmitting Instructions to the Trustee and that
> there may be more secure methods of transmitting Instructions than the
> method(s) selected by the Corporation; (iii) that the security procedures (if
> any) to be followed in connection with its transmission of Instructions
> provide to it a commercially reasonable degree of protection in light of its

particular needs and circumstances; and (iv) to notify the Trustee immediately upon learning of any compromise or unauthorized use of the security procedures.

(Indenture Agreement § 10.09.)

The Agreement also contains provisions defining and limiting the Bank's duties to the Building Corporation with respect to the administration of the Trust. Of specific importance in this case, the Agreement stated: "The Trustee shall not be responsible in any manner for: . . . [T]he default or misconduct of any agent or employee appointed by it, if such agent or employee shall have been selected with reasonable care, or for anything done by it in connection with this trust, except for its willful misconduct or gross negligence." (Agreement § 10.01(f)(4).)

## B. Fraudulent October 12, 2016, Pay Affidavit

The Building Corporation appointed Laura Hubinger as the authorized representative designated to submit pay affidavits to the Bank. (Compl. ¶ 16.) Between March 30, 2016, and October 3, 2016, Hubinger prepared pay affidavits and sent them to the Bank through e-mail. (Compl. ¶¶ 18–19.)

On October 9, 2016, Bradley Moss, a Bank employee, emailed Hubinger about a lease document. (Compl. ¶ 21.) Moss received an automatic "out-of-office" email from Hubinger informing Moss that Hubinger would be on vacation until October 18 or 19. (*Id.*) On October 12, 2016, a fraudulently submitted pay affidavit ("October 12 Pay Affidavit") was sent to the Bank from Hubinger's e-mail account, which an unknown third-party had hacked. (*Id.* ¶ 22.) The Bank's agents and employees processed and paid $120,882.83 from the Trust pursuant to the October 12 Pay Affidavit. After the parties discovered the October 12 Pay Affidavit was

fraudulent, Plaintiffs demanded that the Bank credit $120,882.83 to the Trust but the Bank refused.

**C.     The Plaintiffs' Complaint**

On August 2, 2017, the Plaintiffs filed their Complaint against the Bank and Bradley Moss, in Lake County, Indiana. In finding that the Bank properly removed the case to federal court, this Court dismissed Bradley Moss from the action. (Op. & Order, ECF No. 31.) The Plaintiffs seek damages against the Bank under two theories. In Count I, the Plaintiffs argue that the Bank breached the September 1, 2015, Indenture Agreement by (1) failing to select its agents and employees with reasonable care and, (2) failing to prevent its employees from acting in a grossly negligent manner in processing the October 12 Pay Affidavit and disbursing $120,882.83 in fraudulent vendor payments. (Compl. ¶¶ 34–38.) In Count II, the Plaintiffs allege that the Bank is vicariously liable in tort for the grossly negligent acts of its agents and employees in processing the October 12 Pay Affidavit and disbursing $120,882.83 in fraudulent vendor payments. (Compl. ¶¶ 39–48.)

## ANALYSIS

**A     Legal Standard**

The Defendant seeks dismissal of this case pursuant to Federal Rule of Civil Procedure 12(b)(6). "A motion to dismiss pursuant to [Rule] 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). The Court presumes that all well-pleaded allegations are true, views these well-pleaded allegations in the light most favorable to

the Plaintiff, and accepts as true all reasonable inferences that may be drawn from the allegations. *See Whirlpool Fin. Corp. v. GN Holdings, Inc.*, 67 F.3d 605, 608 (7th Cir. 1995). The Complaint need not contain detailed facts, but surviving a Rule 12(b)(6) motion "requires more than labels and conclusions . . . . Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

In deciding a motion to dismiss, a court is to evaluate the sufficiency of the pleadings, not to examine evidence outside the pleadings. Rule 10(c) of the Federal Rules of Civil Procedure, however, provides that a "copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Therefore, this Court may examine the Pay Affidavit and Indenture Agreement as the Plaintiffs attached these documents as exhibits in their Complaint and as these documents will assist the Court in determining whether dismissal is proper. *See Travelers Casualty & Adecco USA, Inc.*, Civ. No. 2:12-cv-416, 2013 WL 4776771, at *2 (N.D. Ind. Sept. 5, 2013) (Documents attached to a complaint may be examined at the motion to dismiss stage as "such documents may permit the Court to determine that the plaintiff is not entitled to judgment." (quoting *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2002)).

**B.      Breach of Contract Claim**

The Plaintiffs' breach of contract claim is premised on the argument that the Bank violated section 10.01(f)(4) of the Indenture Agreement. (*See* Pls.' Resp., ECF No. 44, pp. 7–11.)

Section 10.01(f)(4) provides that the Bank may be held liable for the default or misconduct of an agent and employee when the Bank failed to select the agent or employee in question with reasonable care. Section 10.01(f)(4) also states that the Bank may be held liable for its willful misconduct or gross negligence. Therefore, the Plaintiffs' Complaint must allege facts that would plausibly suggest that an agent's or employee's default was due to the Bank's failure to select the agent or employee with reasonable care, or that an agent or employee acted with willful misconduct or gross negligence in connection with October 12 Pay Affidavit..

At the outset, the Complaint contains only conclusory allegations that the Bank failed to select its agents or employees with reasonable care. (Compl. ¶ 36.) The Complaint is devoid of any facts suggesting how the Bank selected its agents and employees, much less facts pertaining to the selection of the employees and agents involved in processing the October 12 Pay Affidavit.

Consequently, for their breach of contract claim to survive, Plaintiffs are left with pleading facts that demonstrate the Bank engaged in willful misconduct or gross negligence in violation of the Indenture Agreement. As discussed more fully below, the Plaintiffs have failed to plead such a violation of the Indenture Agreement.

### 1. *Contract Modification*

The Plaintiffs argue that Bank and its employees engaged in misconduct or gross negligence by failing to follow "the established Protocol" for processing pay affidavits. (*See* Pls.' Resp., at p. 8.) The so-called Protocol reflects the procedure the Building Corporation and Bank came to follow after signing the Indenture Agreement for processing pay affidavits. (Compl. ¶¶18–19.) Although the Protocol procedures are absent from the Indenture Agreement, the Plaintiffs contend that the Protocol procedure the parties followed modified their obligations

under the Indenture Agreement such that the Protocol procedures became enforceable. (*See* Pls.'

Resp., at p. 8.) In support, the Plaintiffs cite to established Indiana law[2] holding that

"modification of a contract can be implied from the conduct of the parties." (*See* Pls.' Resp. at p.

9 quoting *Skweres v. Diamond Craft Co.*, 512 N.E.2d 217, 221 (Ind. Ct. App. 1987)). The

Plaintiffs add that "[q]uestions regarding the modification of a contract are one of fact, and are to

be determined by the trier thereof upon the evidence of each case." (*Id.*)

Although the Bank failed to respond to the Plaintiffs' argument in reply, this Court

nevertheless finds the analysis underlying Plaintiffs' contract modification claim incomplete.

First, "questions regarding the modification of a contract are ones of fact, and are to be

determined by the jury upon the evidence in each case." *Gilliana v. Paniaguas*, 708 N.E.2d 895,

897 (Ind.Ct.App.1999). "However, the same can be said of many issues that arise in trials" and

federal courts in this circuit applying Indiana law have ruled on the issue of contract

modification before trial. *See Mark Line Indus., Inc. v. Murillo Modular Grp., Ltd.*, Civ. No.

3:10-cv-189, 2013 WL 393289, at *2–3 (N.D. Ind. Jan. 20, 2013) (deciding on the issue of

contract modification on summary judgment) (quoting *Anderson v. Ne. Otalaryngology, P.C.*,

Civ. No. 106-cv-37, 2006 WL 3487333, at *3 (S.D. Ind. Dec. 1, 2006)). In the same vein, this

Court may properly determine whether the Plaintiffs have sufficiently pled facts demonstrating

that the Indenture Agreement was modified through the parties' conduct before trial.

Turning to the applicable law on contract modification, "[i]t is well established in Indiana

law that a contract modification may be implied from the conduct of the parties." *Anderson*,

2006 WL 3487333, at *3 (collecting federal and state cases). As a contract can be modified by

the conduct of the parties, a modification need not be in writing. *City of Indianapolis v. Twin*

---

[2] The Indenture Agreement is governed by Indiana law. (Indenture Agreement, § 12.06.)

*Lakes Enters., Inc.*, 568 N.E.2d 1073, 1084–85 (Ind. Ct. App. 1991). A contract modification requires an offer, acceptance, and consideration to be enforceable. *S. Ind. Gas & Elec. Co. v. Iowa Pipeline Assocs., Inc.*, Civ. No. 3:06-cv-48, 2009 WL 2987185, at *12 (S.D. Ind. Sept. 15, 2009) (citing *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993)). Where a court has found the parties' conduct modified the contract, the conduct in question was inconsistent from the terms of the original contract. *See Mark Lines Indus.*, 2013 WL 393289, at *3 (*comparing Twin Lakes Enters., Inc.*, 568 N.E.2d at 1084–86 (upholding trial court's decision to give jury instruction regarding contract modification by conduct where both parties took actions "with full knowledge of the conduct of the other on subject matter not theretofore contemplated by any writing . . . ."), *and Skweres.*, 512 N.E.2d at 219–21 (Ind. Ct. App. 1987) (upholding trial court's finding that parties had modified agreement by behaving in a way inconsistent with original agreement and where neither party objected to the inconsistent conduct), *with Vara v. Menard, Inc.*, 2005 WL 2886075, at *8 (S.D. Ind. Oct. 28, 2005) (rejecting argument that parties modified contract, governed by Indiana law, through conduct where conduct was entirely consistent with terms of contract because the "conduct of the parties does not show any intent to modify the terms of their written agreement.").

This Court finds the Protocol procedures that the Plaintiffs assert modified the Indenture Agreement are not inconsistent from the original terms of the Indenture Agreement. The Plaintiffs allege the following Protocol requirements established through the parties' conduct after the Agreement was executed:

- "Before requesting payment to any vendor, Building Corporation is required to file a W-9 for each vendor – as a 1099 is required to be issued to each vendor being paid out of the trust account.

- If a vendor is new and does not have a W-9 on file, then Building Corporation, via Hubinger, sends a W-9 with the invoice as part of the pay affidavit submission.

- Hubinger also prepares the pay affidavit, which contains no account information. The pay affidavit only contains instructions on what invoices are authorized by Building Corporation and to make payment on those invoices. Each vendor invoice is listed as a separate entry on the pay affidavit – so that the pay affidavit tracks with the invoice or statement presented for payment.

- The pay affidavit is then notarized. And, a complete PDF document of the pay affidavit and all corresponding statements/invoices is created.

- Hubinger next emails the PDF file (including the notarized pay affidavit) to Moss, as Trustee for Mellon Trust.

- Upon receipt, if there is any missing vendor information for the vendor or accounting errors, then Moss, or another Mellon Trust agent, calls Hubinger to provide additional or missing information.

- Upon obtaining any additional information (i.e., confirmation and authorization that the vendor information is correct) from Building Corporation, the Mellon Trust issues payments to the vendors per the instructions contained in the pay affidavit.

- Payments are generally issued by check."

(Compl. ¶ 18.)

Section 3.01 of the Agreement governs the procedure the parties are to follow to submit and process pay affidavits. Section 3.01 provides: "All payments from the Construction Account shall be made by the Trustee upon presentation of an affidavit executed by any officer of the

Corporation or the Lessor Representative, stating the character of the expenditure, the amount thereof, and to whom due, together with the statement of the creditor as to the amount owing."

Taking Plaintiffs' factual allegations regarding parties' post-agreement conduct as true, there is no inconsistency between Section 3.01 of the Indenture Agreement and the Protocol. Section 3.01 provides the bare-minimum framework governing the parties in submitting and processing pay affidavits, whereas the Protocol represents the conduct parties engaged in to effectuate performance under Section 3.01. Therefore, the Court finds that the parties' post-agreement conduct, as alleged in the Complaint and reflected in the Protocol, did not modify the terms of the Indenture Agreement such that the Bank's deviation from the Protocol in processing the October 12 Pay Affidavit would give rise to a breach of contract claim.

Furthermore, the Protocol does not meet the requisite elements to give rise to a contract modification. *Hamline v. Steward*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993) ("The modification of a contract, since it is also a contract, requires all the requisite elements of a contract."). "In addition to an offer and acceptance, modification of a contract requires sufficient consideration: that is, there must be a bargained-for-exchange." *Henthorne v. Legacy Healthcare, Inc.*, 764 N.E.2d 751, 759 (Ind. Ct. App. 2002). "To constitute consideration, there must be a benefit accruing to the promisor or a detriment to the promisee." *A&S Corp. v. Midwest Commerce Banking Co.*, 525 N.E.2d 1290, 1292 (Ind. App. Ct. 1988).

The Protocol in this case fails to modify the Indenture Agreement because none of the Protocol procedures evince a bargained-for-exchange between the Bank and the Building Corporation for something of value. Instead, the alleged post-contract conduct unremarkably reflects the steps the parties regularly undertook to effectuate the pay affidavit submission and processing consistent with Section 3.01 of the Agreement. Therefore, the Plaintiffs have pled no

facts to show that the Protocol contains the requisite consideration to constitute an enforceable contract modification.

### 2. *Bank's Failure to Identify Fraudulent October 12 Pay Affidavit*

For their breach of contract claim, the Plaintiffs also contend that the Bank and its employees engaged in misconduct and gross negligence, in violation of Section 10.01(f)(4), when its employees failed to identify that the October 12 Pay Affidavit was fraudulent before processing payment. In support of their argument, the Plaintiffs cite to the fact that Brandon Moss, a bank employee who did not issue the fraudulent payment, received an automatic out-of-office email on October 8, 2016, from Hubinger indicating she would be on vacation until October 18 or 19, 2016. (*See* Pls.' Resp. at pp. 10–11.) According to the Plaintiffs, this out-of-office email should have prompted Bank employees processing the October 12 Pay Affidavit sent from Hubinger's email account to follow-up with the Building Corporation to determine whether Hubinger did indeed send the October 12 Pay Affidavit. (*Id.*)

In further support of the argument that the Bank should have verified the identity of the October 12 Pay Affidavit sender, the Plaintiffs cite to certain "discrepancies" between the October 12 Pay Affidavit and previous pay affidavits. (*See id.*, at p. 8.) The following discrepancies were alleged in the Complaint:

- "The itemized statement/invoice section uses different font and formatting, than prior pay affidavits. The text is rasterized (pixelated), which is further evidence that this document was not generated from a source document.

- The amounts for each invoice/statement on the October 12th Pay Affidavit for each vendor do not match the amounts [on] the actual invoices/statements.

- The first attempted payment by wire transfer for Division 1, Inc., resulted in the wire transfer being rejected as the routing/account numbers for the bank the transfer was sent did not match.

- Instead of reviewing and confirming Division 1's information and contacting Building Corporation to confirm information on file for this vendor, the wire was reissued the next business day.

- The vendor names, accounts and routing information do not match the invoices/statements in relationship to the additional wiring instructions provided for payment.

- The services or materials alleged to have been provided are either identical to immediate prior pay affidavits, or identified differently on the October 12th Pay Affidavit from the invoice/statement. It is evident that many of the purported services and materials have no relationship to the construction of the Project.

- Vendor payments had been paid almost exclusively by check – not wire transfer. The only other time wire transfer(s) were used to pay vendors was when the trust account was initially funded in March 2016.

- The date on the October 12th Pay Affidavit is overwritten and is in handwriting not identical or similar to any of the authorized signatories. A simple review of the prior signatures by would have confirmed that this handwritten date was by someone other than those authorized to submit a pay affidavit."

(Compl. ¶ 28.) The Plaintiffs argue that the above-listed discrepancies plus the out-of-office email should have prompted the Bank to "take the simple step of contacting the Building

Corporation" to confirm the validity of the October 12 Pay Affidavit. (*See* Pls.' Resp., at pp. 5, 8.)

Contrary to the Plaintiffs' assertions, however, a failure to follow-up in light of the out-of-office email and the October 12 Pay Affidavit discrepancies is not misconduct or gross negligence on the part of the Bank or its employees in breach of the Indenture Agreement.[3] The Indenture Agreement is explicit; the Bank and the Bank's employees do not have a duty to verify the authenticity of an email including a pay affidavit and vendor disbursement instructions from an Authorized Officer's email account. The Agreement provides that the Bank "*shall conclusively presume* that directions that purport to have been sent by an Authorized Officer . . . have been sent by such Authorized Officer." (Indenture Agreement §10.09) (emphasis added). Consequently, instead of engaging in some misconduct or gross negligence by not following-up with the Building Corporation regarding the authenticity of the October 12 Pay Affidavit, the Bank employees performed exactly as they were required to under the Indenture Agreement. The Bank and its employees conclusively presumed that the October 12 Pay Affidavit sent from Hubinger's email account was from Hubinger herself and processed the Pay Affidavit in accordance with the Indenture Agreement. Neither the Bank nor its employees could have engaged in misconduct or gross negligence by following the express terms of the Indenture Agreement. Therefore, the Plaintiff's argument that the Bank breached the Agreement when its employees processed the October 12 Pay Affidavit without identifying that it was fraudulent is unpersuasive.

_____

[3] The Plaintiffs also make the argument that the out-of-office email notification constituted "*previous written instructions*" regarding the processing of the October 12 Pay Affidavit. (*See* Pls.' Resp. 10–11 (emphasis in original).) The Court finds that the Plaintiffs' argument is meritless. The automatic out-of-office email contained no instructions regarding how the Bank was to process future pay affidavits.

### 3. *Exculpatory Clause*

The Plaintiffs cannot escape that the Indenture Agreement explicitly contemplated liability in a situation where a third party fraudulently assumes the identity of an Authorized Officer to send the Bank a fraudulent pay affidavit. (Indenture Agreement § 10.09.) The Indenture Agreement expressly stated that if a fraudulent pay affidavit was submitted, the Building Corporation would "assume all risks arising out of the use of Electronic Means to submit Instructions, and the risk of interception and misuse by third parties." (*Id.*) The parties also agreed that the "Trustee shall not be liable for any losses, costs or expenses arising directly or indirectly from the Trustee's reliance upon and compliance with such Instructions notwithstanding such directions conflict or are inconsistent with a subsequent written instruction." (*Id.*) The Indenture Agreement even included a statement that Building Corporation understands why the Bank was to be absolved of liability stemming from the Bank's processing of a fraudulent pay affidavit submitted through e-mail: "The Corporation understands and agrees that the Trustee cannot determine the identity of the actual sender of such Instructions." (*Id.*)

The Plaintiffs counter that Section 10.09 is an unenforceable exculpatory clause against public policy because the Indenture Agreement affects public education in Indiana.[4] (*See* Pls.' Resp., at pp. 11–12.) In support of its argument, the Plaintiffs cite a case—in which the Indiana Court of Appeals held that an exculpatory clause in an advertising contract was not against public policy—for the proposition that "Indiana recognizes a 'public interest' exception to exculpatory clauses when 'the transaction affects the public interest such as . . . businesses generally thought to be suitable for regulation or which are thought of as a practical necessity for

---

[4] Lake Ridge New Tech Schools is a public school corporation and the Building Corporation was incorporated for the sole purpose of procuring funds for the construction and renovation of Calumet High School.

some members of the public.'" (*See* Pls.' Resp., at p. 11 citing *Pinnacle Comput. Servs., Inc. v. Ameritech Publ'g, Inc.*, 642 N.E.2d 1011, 1014 (Ind. Ct. App. 1994).)

Besides not citing a case where an exculpatory clause was deemed contrary to public policy because the agreement affected public education, the Plaintiffs cherry-picked language from the Indiana Court of Appeal's decision in *Pinnacle* without acknowledging language that undermines their argument. The Indiana Court of Appeals in *Pinnacle* stated:

> Although no public policy exists to prevent contracts containing exculpatory clauses, an exception exists where the transaction affects the public interest such as public utilities, common carriers, innkeepers and public warehousemen and *situations where the indispensable need of one party for the services of another deprives the customer of all real equal bargaining power*.

*Pinnacle*, 642 N.E.2d, at 1017–18 (emphasis added).

Accordingly, the Indiana Court of Appeals makes clear in *Pinnacle* that an exculpatory clause is unenforceable in situations—beyond those specially enumerated—where by virtue of the parties' unequal bargaining power, one party is forced to accept the terms of the party with the greater bargaining power. No facts alleged in the Complaint suggest such an imbalance in bargaining power in this case. For example, there is no indication that the Plaintiffs were only able to negotiate with the Bank of New York Mellon for the administration of their trust. There is also no indication that the Plaintiffs were unable to negotiate away the exculpatory clause contained in Section 10.09 due to their supposed weaker bargaining position. Thus, the exculpatory clause provides an independent basis warranting dismissal of the Plaintiffs' breach of contract claim at the motion to dismiss stage.

For the reasons stated within this section, the Court finds that the Plaintiffs have not sufficiently pled they are entitled to relief for breach of the Indenture Agreement.

**C.      Tort Claim**

The Plaintiffs allege that the Bank is liable for the negligence and gross negligence of its employees and agents in processing the October 12 Pay Affidavit.

### *1.   Duty Independent of Indenture Agreement*

To establish a negligence or gross negligence claim, the Plaintiffs must meet the following three elements: (1) the Bank owes a duty to the Plaintiffs; (2) the Bank breached that duty; and (3) the Plaintiffs suffered an injury proximately caused by the breach of that duty. *See Jaffri v. JPMorgan Chase Bank, N.A.*, 26 N.E.3d 635, 638 (Ind. Ct. App. 2015); *see also Sims v. Humane Soc. of St. Joseph Cnty. Ind., Inc.*, 758 F. Supp. 2d 737, 751 (N.D. Ind. 2010) ("Negligence and gross negligence possess the same elements (duty, breach, and injury), but the two torts have different definitions of what constitutes a 'breach.'" (citing *N. Ind. Pub. Serv. Co. v. Sharp*, 790 N.E.2d 462, 465–66 (Ind. 2003))).

The Supreme Court of Indiana has held that a breach of contract does not give rise to a tort claim unless a legal duty independent of the contract itself has been violated. *Greg Allen Constr. Co. v. Estelle*, 798 N.E.2d 171, 175 (Ind. 2003). "Thus, in order to plead a tort claim that arises out of a contractual relationship, a party must allege, first, that the defendant committed a separate and independent tort, and second, that the tort resulted in an injury distinct from that resulting from the breach of contract." *Forest River Mfg., LLC v. Lexmark Enter. Software, LLC*, Civ. No. 3:16-449, 2017 WL 1906164, at *2 (N.D. Ind. May 9, 2017) (citing *Estelle*, 798 N.E.2d at 173; *Sheaff Brock Inv. Advisors, LLC v. Morton*, 7 N.E.3d 278, 288 (Ind. Ct. App. 2014). "[T]he question is not only whether the plaintiff has pled each element of the tort claim in

question, but also whether it has alleged an injury distinct from the breach." *Forest River Mfg.*, 2017 WL 1906164, at *2 (citing *Estelle*, 798 N.E.2d at 173).

The Plaintiffs fail to allege a separate duty independent of the Indenture Agreement. The Plaintiffs claim that the Bank is liable in tort because the Bank "failed to select its agents and employees in a manner which would have prevented the payment of $120,882.83 in unauthorized vendor payments from the trust account." (Compl. ¶ 41.) The Plaintiffs also claim that the Bank is liable in tort because its employees and agents "acted in a grossly negligent manner in making $120,882.83 in unauthorized vendor payments from the trust account based upon a clearly fraudulent Pay Affidavit." (Compl. ¶ 42.) The Plaintiffs can only seek relief for the injuries alleged in Plaintiffs' tort claims by virtue of the duties the Indenture Agreement bestowed on the Bank to the Building Corporation. In other words, without the Indenture Agreement, there would be no basis for Plaintiffs to seek relief from the Bank. *See Estelle*, 798 N.E.2d at 175 ("The rule of law is that a party to a contract or its agent may be liable in tort to the other party for damages from negligence that would be actionable if there were no contract, but not otherwise."). Therefore, the Plaintiffs impermissibly repurpose their breach of contract claim into a tort claim.

Nevertheless, the Plaintiffs offer several counter arguments that the Bank owed the Plaintiffs a duty independent of the Indenture Agreement.

### a. Fiduciary Duties

The Plaintiffs counter that the Bank owed fiduciary duties to the Plaintiffs based on the Bank's role as trustee. (Pls.' Resp. at pp. 6–7, 12.) The Plaintiffs, however, do not offer any authority that an indenture trustee, like the Bank in this case, has the same fiduciary duties as a

traditional, common-law trustee. Indiana Code § 30-4-1-1(a) states that a "trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." Subsection (c), however, creates an exception for security instruments, such as the Indenture Agreement, from the fiduciary duties imposed on traditional trustees. *See* Ind. Code § 30-1-1(c)(3). The Court is therefore unconvinced that, as a matter of law, the Bank owed fiduciary duties to the Plaintiffs.

Even if the Bank owed fiduciary duties to the Plaintiffs, actions which are expressly authorized and fully comply with the terms of a contract cannot serve as the basis for a breach of fiduciary duty claim. *See Carty v. Westport Homes of N.C., Inc.*, 472 Fed. App'x 255, 259 (4th Cir. 2012) (interpreting Indiana law to affirm lower court's dismissal of breach of fiduciary duties claim where defendant's actions fully complied with the parties' contract). Hence, even if the Bank owed fiduciary duties to the Plaintiffs, the Bank did not breach such fiduciary duties as it complied with Sections 3.01 and 10.09 of the Indenture Agreement, as discussed above, by relying on the payment instructions contained in the October 12 Pay Affidavit.

### b. Special Duty of Trust and Care

The Plaintiffs argue that the Bank owed special duties of care and trust due to the Bank's position as an "expert financial institution with extensive experience administering debenture agreements." (*See* Pls.' Resp. at p. 14.) In support of the proposition that the Bank owed a special duty of trust to the Plaintiffs, the Plaintiffs cite to *Yost v. Wabash College*, 3 N.E.3d 509, 517 (Ind. 2014), and *Illinois Bulk Carrier, Inc. v. Jackson*, 908 N.E.2d 248, 260 (Ind. Ct. App. 2009). In support of the proposition that the Bank owed a special duty of care to the Plaintiffs, the Plaintiffs cite *Sports, Inc. v. Gilbert*, 431 N.E.2d 534 (Ind. Ct. App. 1982).

The cases the Plaintiffs cite are either inapplicable to the present case or stand for propositions different than the Plaintiffs' offered interpretation. In *Yost*, the Indiana Supreme Court was asked to decide whether a college had a duty to protect a student from criminal activity and hazing. *See Yost*, 3 N.E.3d at 516–17. The Indiana Court of Appeal in *Illinois Bulk Carrier* dealt with the issue of when a principal is liable for its independent contractor's negligence. *Illinois Bulk Carrier*, 908 N.E.2d at 260. Finally, *Gilbert* concerned the issue of whether a company owed a duty to the "motoring public" to detain an intoxicated motorist who would subsequently be involved in a fatal accident. *Gilbert*, 431 N.E.2d at 535. These cases do not deal with the duties owed by a bank or financial institution.

In the absence of authority to contrary, this Court finds that under Indiana law, the Bank did not owe Plaintiffs a special duty of care or trust. *See Jaffri*, 26 N.E.3d at 639 ("[T]he mere existence of a relationship between parties of bank and customer . . . does not create a special relationship of trust and confidence.").

### c.   *Duty to Perform Ministerial Tasks with Due Care*

Lastly, the Plaintiffs contend that the Bank, as indenture trustee, had a duty to perform ministerial functions with due care—a duty independent of the Agreement. (*See* Pls.' Resp. at p. 14.) The Plaintiffs cite to a decision interpreting a New York law-governed contract to assert that the Bank has an extra-contractual duty to perform non-discretionary tasks with due care. (*Id.*, at p. 15 citing *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, N.A.*, 247 F. Supp. 3d 377 (S.D.N.Y. 2017).) The Plaintiffs have not cited authority evidencing that a similar extra-contractual duty exists under Indiana law for indenture trustees. Therefore, this Court is satisfied that the Bank only owed those duties expressly stated in the Agreement.

(Indenture Agreement § 10.01(a) ("The Trustee . . . undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.").

As the Plaintiffs have failed to allege facts demonstrating that the Bank owed a duty independent of the Indenture Agreement, this Court finds that the Plaintiffs' tort claims warrant dismissal.

### 2. *Economic Loss Doctrine*

The Court also finds that the Plaintiffs' tort claim is barred as a matter of law under the economic loss doctrine.

The economic loss doctrine holds that disputes involving only economic losses between parties in privity of contract should be resolved by contract law instead of tort law. *See Indianapolis-Marion Cnty. Pub Library v. Charlier Clark  Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010). ("[T]he economic loss rule reflects that the resolution of liability for purely economic loss caused by negligence is more appropriately determined by commercial rather than tort law"). The Seventh Circuit stated that in situations "[w]here there are well-developed contractual remedies [ ... then] there is no need to provide tort remedies [ ... because] [t]he tort remedies would duplicate contract remedies, adding unnecessary complexity to the law." *All–Tech Telecom, Inc. v. Amway Corp.,* 174 F.3d 862, 865 (7th Cir. 1999). "Worse, the provision of these duplicative tort remedies would undermine contract law" because the incentives to negotiate and strike bargains in contract would be reduced if aggrieved parties could simply use tort law to renege bargains reached in contract that they no longer supported. *Id.*

The Court finds that the economic loss doctrine is applicable in this case. The injuries that the Plaintiffs suffered as a result of the Bank processing the October 12 Pay Affidavit, a

process governed by the Indenture Agreement, is the only injury the Plaintiffs allege in their Complaint. The Plaintiffs have not pled any injury resulting from the Bank's alleged negligence or gross negligence that is distinct from the injury that has been pled resulting from the Bank's alleged breach of the Indenture Agreement.

The Plaintiffs offer two arguments for why the economic loss doctrine does not apply. They first contend that the economic loss doctrine does not apply because the Bank "was a financial professional in a superior position of power and trust over the Plaintiffs and the taxpayer dollars." (*See* Pls.' Resp. 17–18.) As discussed above, the relationship between the Bank, as indenture trustee, and the Plaintiffs did not create a special relationship between the parties with the Bank owing an extra-contractual duty of trust and care. Moreover, the economic loss doctrine does not include the relationship involving an indenture trustee as one that falls outside the scope of the economic loss doctrine. *See Indianapolis-Marion Cnty. Pub. Library*, 929 N.E.2d at 736 ("But Indiana courts should recognize that the [economic loss doctrine] rule is a *general* rule and to be open to appropriate exceptions, such as (for the purposes of illustration only) lawyer malpractice, breach of a duty of care owed to a plaintiff by a fiduciary, breach of a duty to settle owed by a liability insurer to the insured, and negligent misstatement." (emphasis in original)).

Second, the Plaintiffs argue that the economic loss doctrine arises in product liability cases and construction defect cases because the primary concern of the doctrine is plaintiffs seeking to "circumvent the effect of warranties." (*See* Pls.' Resp. at p. 18.) Plaintiffs argument is unconvincing as courts in our circuit have applied the economic loss doctrine outside the products liability and construction defect contexts. *See, e.g.*, *Travelers Cas. and Sur. Co. of Am. v. Adecco USA, Inc.*, 2013 WL 4776771 (N.D. Ind. Sept. 5, 2013) (applying the economic loss

doctrine to dismiss plaintiff's tort claims against staffing agency where the staffing agency referred an employee who subsequently stole from plaintiff); *First Internet Bank of Ind. v. Lawyers Title Ins.*, 2009 WL 2092782 (S.D. Ind. July 13, 2009) (applying the economic loss doctrine to dismiss tort claims concerning defendant's issuance of a title insurance policy to plaintiff).

Consequently, the economic loss doctrine provided an independent basis to dismiss the Plaintiffs' tort claims.

## CONCLUSION

For the reasons set forth above, the Defendant's Motion to Dismiss the Plaintiff's Complaint for Failure to State a Claim [ECF No. 38] is GRANTED.

SO ORDERED on November 13, 2018.

s/ Theresa L. Springmann
CHIEF JUDGE THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT
FORT WAYNE DIVISION
